UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| AMANDA R. HENDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15 CV 1624 JMB |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER[2]

Amanda Rose Henderson ("Plaintiff") appeals the final decision of the Acting
Commissioner of Social Security ("Defendant") denying her application for supplemental
security income ("SSI") benefits under Title XVI of the Social Security Act. See 42 U.S.C. §§
1381 *et seq*. Substantial evidence supports Defendant's decision, and it is therefore
**AFFIRMED**.

## I.    Background and Procedural History

Plaintiff applied for SSI benefits on May 13, 2013, alleging that she became disabled on
January 1, 2011, due to depression, learning disability, high blood pressure, anxiety, and sleep
problems. (Tr. 94, 160, 202) Plaintiff's application was initially denied on January 27, 2013.
(Tr. 94) Plaintiff requested a hearing before an administrative law judge ("ALJ"), and the ALJ

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to
Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Carolyn W. Colvin as the defendant
in this suit. No further action needs to be taken to continue this suit by reason of the last
sentence of section 205(g) of the Social Security Act.

[2] This matter is pending before the undersigned United States Magistrate Judge with the
consent of the parties, pursuant to 28 U.S.C. § 636(c). The Court has reviewed the entire
administrative record in this matter, but will only discuss those portions of the record most
pertinent to the issues raised by the parties.

held a hearing on May 28, 2014, at which Plaintiff testified, with counsel present. In a decision dated June 27, 2014, the ALJ found that Plaintiff was not disabled under the Act. (Tr. 19-32) Plaintiff appealed the ALJ's decision, but the Appeals Council declined review. (Tr. 1) The ALJ's decision therefore stands as the Commissioner's final decision, and the matter is properly before this Court. See 42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

The ALJ conducted one hearing in this matter. On May 28, 2014, Plaintiff appeared in person with her attorney. At the beginning of the hearing, Plaintiff's counsel advised that Plaintiff had no objections regarding any of the exhibits in the record. At the end of the hearing, counsel advised that the record need not remain open.

### A.  Hearing Testimony

#### 1)  Plaintiff's Testimony (Tr. 40-64)

Plaintiff testified in response to questions posed by the ALJ and her attorney. Plaintiff testified that she became disabled by January 1, 2011, when she became "very depressed." (Tr. 42) Plaintiff named a number of doctors who had treated her in the past for mental health concerns, and stated that she had been seeing her current doctor, Dr. Manikant Desai, M.D., for a "couple months." (Tr. 45) Plaintiff indicated that her next appointment with Dr. Desai was scheduled for later that day. (Tr. 56) At the time of the hearing, Plaintiff was prescribed various medications, including Cymbalta, Buspar, Topamax, and Abilify. (Tr. 45)

Plaintiff testified that she had been homeless in both Kansas City and St. Louis, Missouri, but had since received a "shelter plus care voucher" that allowed her to live alone in an apartment. (Tr. 44-46) Plaintiff informed the ALJ that she prepares her own meals, does her own shopping and laundry, and has no difficulty taking care of personal needs. (Tr. 47, 49, 51)

Plaintiff claimed that she sleeps all but two or three hours out of the day due to depression and because she has "nothing else to do." (Tr. 48) Plaintiff explained that she wakes up frequently during the night, but "once the daylight hits [she] can sleep all day." (Tr. 62) Plaintiff also testified that she would miss appointments without the assistance of her caseworker. Plaintiff reported that she was let go from her last job as a certified nursing assistant because she did not want to get out of bed to attend work. (Tr. 53) Plaintiff also testified regarding the abuse she had suffered in her past. (Tr. 63-64)

### 2) **Medical Expert Testimony** (Tr. 64-78)

Dr. Michael Cremerius, Ph.D., a licensed psychologist, testified at the administrative hearing. Dr. Cremerius considered Plaintiff's medical records and hearing testimony. Dr. Cremerius opined that Plaintiff suffered from: (1) borderline intellectual functioning (learning disability); (2) depression; (3) post-traumatic stress disorder ("PTSD"); (4) personality disorder with borderline features; and (5) cannabis and cocaine abuse (in remission). (Tr. 65-66) Dr. Cremerius opined that none of Plaintiff's mental impairments rose to the level of any psychiatric or psychological listing. (Tr. 74)

Dr. Cremerius found that Plaintiff generally complied with her medical direction by taking her medication and calling her providers for refills when necessary. Dr. Cremerius testified that he thought Plaintiff had moderate difficulties in the areas of concentration, persistence, or pace, but that Plaintiff could perform simple, routine tasks with occasional contact with coworkers and supervisors. Dr. Cremerius further testified that, in his opinion, working would be good for Plaintiff. (Tr. 75)

In an exchange that is at issue herein and discussed infra, the ALJ asked Dr. Cremerius specifically about Exhibit B7-F. Exhibit B7-F contained two pages of handwritten notes by Dr.

Desai, from March and April 2014. Plaintiff's attorney identified a reference to Ritalin prescribed for ADHD. (Tr. 69) The ALJ asked for clarification, and Plaintiff advised that she had taken medication for attention deficit disorder. (Tr. 70)

Plaintiff's attorney also noted that Exhibit B7-F included a typed portion indicating a diagnosis of "schizoaffective disorder chronic." (Tr. 68) The ALJ later asked Dr. Cremerius to clarify whether a schizoaffective diagnosis represented a substantial change in Plaintiff's history. Dr. Cremerius explained that it did not. Dr. Cremerius explained that another provider had diagnosed plaintiff as bipolar, and bipolar, schizoaffective, and depression are all mood disorders. (Tr. 73) Dr. Cremerius also explained that the schizoaffective diagnosis likely stemmed from Plaintiff's reporting hearing a soft talk or voice in the past. (Tr. 73)[3]

Dr. Cremerius testified specifically regarding the severity of Plaintiff's mental impairments. (Tr. 74-75) Dr. Cremerius found that Plaintiff had only mild limitations in her activities of daily living, but moderate limitations in social functioning, and concentration, persistence or pace. Plaintiff's counsel specifically asked Dr. Cremerius to discuss any distinctions between moderate and marked limitations. In response, Dr. Cremerius noted that, apart from transportation problems, Plaintiff was organized and able to follow through, and that working would benefit Plaintiff. (Tr. 75, 77) Dr. Cremerius further explained that "the symptoms described across three treating sources would certainly support [Plaintiff] being able to do more routine tasks in settings that required … occasional contact with coworkers and supervisors." (Tr. 75) Furthermore, he found that Plaintiff's symptoms were "relatively well managed, and certainly to the point that she could [do] simple routine tasks." (Tr. 77) Dr.

---

[3] Dr. Cremerius further explained that "schizoaffective wouldn't be completely inconsistent with the evidence…. [I]s it a recurring depressive disorder and a personality disorder or is it a mood disorder, depression or schizoaffective or bipolar II and a personality disorder? It's a toss up." (Tr. 73-74)

Cremerius explained that, in his view, Plaintiff's treatment was relatively infrequent, and "if somebody is that markedly impaired, they'd be seen a whole lot more frequently." (Tr. 76)

### 3) <u>Vocational Expert</u> (Tr. 80-85)

Vocational expert ("VE") James Israel testified in response to hypothetical questions posed by the ALJ and Plaintiff's counsel. The ALJ asked the VE to consider a hypothetical person of Plaintiff's age, education and work experience, who has no exertional limitations, but who should avoid working in environments with concentrated fumes, odors, dusts and gases, high heat and humidity. The hypothetical person could only perform "simple routine work that [would not] require teamwork type interaction with coworkers; generally limited interaction with supervisors … minimal communication needed [for] simple routine work," and no close interaction with the public. (Tr. 80-81)

The VE testified that such hypothetical person could perform several jobs available in the economy, including: (1) door assembler; (2) wrapper; and (3) food sorter. (Tr. 81-82) In response to further limitations posed by the ALJ and Plaintiff's counsel, the VE testified that if the hypothetical person missed work at least twice a month, employers would soon "deem this person unreliable and would move to replace them." (Tr. 82-83) Further, if the hypothetical person arrived late, left early, stepped away from work for additional break time unpredictably (but at least once per week), or took a daily break to cry openly, such an individual would be precluded from employment. (Tr. 83, 84)

The VE testified that if the hypothetical person was off task 15 percent of the day, the number of viable job options would drop by 50 percent. If the hypothetical person was off track more than 15 percent of the day the VE testified that "jobs drop off precipitously." (Tr. 83-84)

At the close of the hearing, the ALJ noted that the ALJ might send Plaintiff to see a doctor, but that it was unlikely. Plaintiff's attorney did not raise any concerns regarding the completeness of the record, request any additional examination, or to seek expand or clarify the record. (Tr. 85-86)

**B.    Plaintiff's Work History and Function Reports** (Tr. 210-228)

Although minimal, Plaintiff's past work included hardware store employee, cook, dishwasher, waitress, cashier, and certified nursing assistant. (Tr. 221) Plaintiff's function report indicates that she prepares meals for herself, does her own laundry and dishes, and drives.[4] (Tr. 212-13) As to her limitations, Plaintiff stated that she needs reminders to take her medications and to perform household chores. (Tr. 212) Plaintiff stated that she does not go out in public because she does not like "being around a bunch of people." (Tr. 213) Plaintiff also alleged that her impairments affect her ability to talk, see, complete tasks, concentrate, and understand. (Tr. 215) Plaintiff did not allege difficulties getting along with others, with memory, or with following instructions. (Id.) Finally, Plaintiff indicated that she can pay attention "for about 20 [minutes]," and that she can sometimes follow written instructions very well. She indicated that she follows spoken instructions better than written instructions. (Id.)

**C.    Other Record Evidence**

**1)    Medical Records**

The record before this Court does not include medical records from the time of Plaintiff's alleged onset date of January 1, 2011, through October of 2012. In October of 2012, Plaintiff began treatment at Truman Behavioral Health. Treatment notes from October 10, 2012, indicate that Plaintiff had been off her anti-depressant medication for a year prior to her initial visit. (Tr.

---

[4] Other evidence indicates that Plaintiff does not have a car and depends on others means of transportation.

259)  The notes also indicate that Plaintiff had intact attention, concentration and memory, and that her thought form was logical and linear.  (Tr. 260)  Plaintiff received diagnoses of depressive disorder and PTSD, and a Global Assessment of Functioning ("GAF") score of 52-55.[5]  (Tr. 261-62)  Notes from follow-up treatment on December 5, 2012, are substantially similar.  (Tr. 271)

In April and May 2013, Plaintiff's mental health treatment transitioned to ReDiscover Mental Health.  The relevant records indicate Plaintiff received treatment for PTSD and depression.  (Tr. 355-91)  During this time, Plaintiff was staying in a shelter for domestic violence victims.  Treatment notes from ReDiscover reflect an additional diagnosis of borderline intellectual functioning.  (Tr. 355)  The notes identified Plaintiff's "strengths and abilities" as a client included her "ability to form and maintain relationships," her "ability to manage activities [of] daily living," and her "cheerful" attitude.  (Tr. 367)  Barriers to treatment included financial challenges and unstable living conditions.  (Id.)

The ReDiscover records include an unsigned mental status exam, dated April 11, 2013.  (Tr. 369-71)  The mental status exam reported that Plaintiff had no "organic behavioral symptoms observed by others or reported by [Plaintiff];" she was alert, awake, fully aware, and responsive during the exam; fully oriented, with appropriate affect; she had intact memory; an average fund of knowledge; and good insight and intact judgment.  (Tr. 369-71)

The ReDiscover records indicate that, on May 14, 2013, Plaintiff advised that "she would not be back for future appointments."  (Tr. 387)  ReDiscover closed their chart on Plaintiff at her request.

---

[5] A GAF score of between 51-60 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attack) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)."  Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 35 (4th ed.) ("DSM-IV").

The administrative record also indicates that, between May 2013 and November 2013, Plaintiff sought treatment for various physical complaints such as asthma, allergic rhinitis, obesity, and back-pain/lumbago. In November of 2013, Plaintiff sought treatment at BJC Behavioral Health ("BJC") and reported that she had not taken her psychiatric medications since April of 2013. (Tr. 461) On November 13, 2013, Plaintiff saw Dr. Rachel Morel, D.O., at BJC. Dr. Morel conducted a psychiatric evaluation. Dr. Morel diagnosed Plaintiff with depression and PTSD and prescribed medication to address her symptoms. Dr. Morel found Plaintiff's thought process to be goal directed and logical, her language and memory intact, and her attention span normal. Dr. Morel opined that "Patient is alert and oriented … with average intellect." (Tr. 461-62) Dr. Morel assigned a GAF score of 45[6] at this visit, and again on a follow-up visit on December 12, 2013. (Tr. 462, 464) December 2013 records regarding Plaintiff's treatment for back pain, asthma, and obesity noted that Plaintiff showed "no unusual anxiety or evidence of depression." (Tr. 557)

In 2014, after Dr. Morel left BJC, Plaintiff commenced treatment with Dr. Muhammad Baber, M.D. Dr. Baber's treatment notes indicate that Plaintiff had received medication refills over the prior few months but had not made any appointments since December of 2013. Dr. Baber described Plaintiff as having fair concentration and memory, and estimated her intellect to be in the average range. (Tr. 466-67) Dr. Baber assigned Plaintiff a GAF score of 50. (Tr. 467)

On April 21, 2014, Plaintiff received treatment from Dr. Manikant Desai, M.D., at BJC. Dr. Desai's treatment notes indicate a diagnosis of schizoaffective disorder and a change in Plaintiff's medication from Seroquel to Abilify. (Tr. 475) Dr. Desai's notes also indicate that

---

[6] A GAF score of 41-50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." DSM-IV.

Plaintiff tolerated her medications "well" and reported "no side effects". (Id.) As noted in the transcript of the administrative hearing, some of Dr. Desai's notes are illegible.

### 2) Medical Opinion Evidence

The only medical opinion evidence comes from a state agency decision-maker named Ioan Dacila. Ioan Dacila does not qualify as an acceptable medical source under the relevant social security rules. As such, the ALJ reviewed this opinion as a "non-acceptable medical source report." (Tr. 29) Dacila reported that Plaintiff had moderate physical limitations, and indicated moderate environmental limitations, including avoiding concentrated exposure to cold or heat, and avoiding fumes, odors, dusts, gases, poor ventilation, and hazardous machinery or heights. (Tr. 101-02)

No treating source opined that Plaintiff qualifies as physically disabled, or submitted any opinion evidence describing additional physical limitations. No sources, including treating sources, submitted opinion evidence regarding Plaintiff's mental impairments except psychologist Michael Stacy, Ph.D., and testifying expert Dr. Cremerius. Dr. Stacy noted moderate limitations in Plaintiff's mental functioning, but ultimately concluded that Plaintiff "retains the ability to understand and remember simple instructions;" can "carry out simple work instructions" while maintaining "adequate attendance and sustain an ordinary routine without special supervision;" and "can interact adequately with peers and supervisors in a normal work setting." Finally, Dr. Stacy found that Plaintiff "can adapt to most changes common to a competitive work setting." (Tr. 103-04)

In addition, Dr. Cremerius made several findings after reviewing the medical evidence and listening to Plaintiff's hearing testimony. Dr. Cremerius discussed his opinions at the hearing, subject to questioning and clarification by Plaintiff's attorney.

### 3) __School Records__

Plaintiff's school records reference multiple diagnoses, including learning disabilities, and difficulty with listening comprehension, vocabulary development, and verbal expression. The records also document fine and gross motor skill delays. (Tr. 395) Plaintiff received special education services from August 1992 through at least 2004. (Tr. 393, 415)

An individualized education plan ("IEP") from 2003-04 noted that Plaintiff was deficient in the areas of basic reading, written expression, mathematics, and listening comprehension. For instance, in the 12th grade, Plaintiff read at a 4th grade level. (Tr. 417) The school district also gave Plaintiff a Wechsler Adult Intelligence Scale III test, which resulted in a Verbal IQ of 76, a Performance IQ of 70, and a Full Scale IQ of 71. (Id.) The IEP also identified that Plaintiff had "difficulty" remembering orally presented information, but "she performs better" when the information is repeated. (Id.)

## III.   __ALJ's Decision__

On June 27, 2014, the ALJ issued a detailed, written decision finding Plaintiff not disabled. The ALJ's decision adhered to the five-step process required by the Commissioner's regulations. 20 C.F.R. § 404.1520(a).

At steps one through three, the ALJ found that: (1) Plaintiff had not been gainfully employed since her alleged disability onset date; (2) Plaintiff had the severe impairments of asthma, learning disabilities, borderline intellectual functioning, major depressive disorder, PTSD, bipolar disorder, and personality disorder;[7] and (3) none of Plaintiff's impairments, either

---

[7] The ALJ found Plaintiff's other alleged impairments (e.g., high blood pressure, back pain, rhinitis, cellulitis, and others) to be non-severe. The ALJ also considered and took into account Plaintiff's obesity and prior substance abuse, but found that neither of these problems reduced Plaintiff's overall functional abilities. (Tr. 21-22) Plaintiff does not challenge herein the ALJ's treatment of her non-severe impairments.

singly or in combination, met or medically equaled the severity of one of the listed impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 21-22)

In assessing Plaintiff's mental impairments, the ALJ applied the special technique found in 20 C.F.R. § 416.920a.  Relying on the testimony of Dr. Cremerius and Plaintiff's own reports, the ALJ concluded that Plaintiff had mild restrictions in her activities of daily living, and moderate restrictions in terms of social functioning and concentration, persistence, or pace.[8]  (Tr. 23, 215)

As part of step four, the ALJ assessed Plaintiff's Residual Functional Capacity ("RFC"). The ALJ described Plaintiff's RFC as follows:

> [Plaintiff] has the [RFC] to perform a full range of work at all exertional levels but should avoid working in areas of concentrated noxious fumes, odors, dusts, gases, high humidity, and high heat; limited to simple, routine work that does not require teamwork such as interaction with coworkers; limited interaction with supervisors to [the] extent needed to conduct simple and routine type work; no close interaction with the public.

(Tr. 24)

In determining Plaintiff's RFC, the record indicates that the ALJ considered the medical evidence in the record, evaluated Plaintiff's credibility, and weighed the relevant opinion evidence.

Regarding opinion evidence, the ALJ gave significant weight to the opinions of state agency psychologist Dr. Stacy, and great weight to the findings and opinions of medical expert Dr. Cremerius.  (Tr. 29)  Although there were no specific opinions from any of Plaintiff's treating sources, the ALJ also considered the low GAF scores assigned

---

[8] A third party function report completed by Plaintiff's mother identified limitations concerning Plaintiff's ability to pay attention, noting that Plaintiff "gets distracted easily" and can only pay attention "15 to 30 minutes then gets sidetracked."  (Tr. 234)  The ALJ found that such representations, like the Plaintiff's own representations, were "inconsistent with the preponderance of the opinions and observations by qualified medical personnel."  As such, these statements were not proof of disability.  (Tr. 29)

by some of those sources.  The ALJ agreed that Plaintiff's mental difficulties caused moderate difficulties with social and occupational functioning.  The ALJ gave little weight to the GAF scores because GAF scores reflect only a "snapshot" in time, they are highly subjective, and they have been eliminated from use in the most recent version of the Diagnostic and Statistical Manual of Mental Disorders ("DSM").   (Tr. 29-30)

The ALJ also found Plaintiff's allegations "not entirely credible." (Tr. 25)  The ALJ based this finding on several factors, including Plaintiff's history of "repeatedly fil[ing] applications for supplemental security income benefits;" her work history; an apparent "motivat[ion] for seeking disability benefits;" and medical evidence which did not support the level of disability claimed.  (Tr. 26)  The ALJ's adverse credibility findings are not specifically challenged herein.

After determining Plaintiff's RFC, and having concluded that Plaintiff had no past relevant work, the ALJ proceeded to step five of the sequential process.  At step five, based on the VE's hearing testimony and Plaintiff's RFC, the ALJ concluded that Plaintiff could perform jobs that exist in significant numbers in the national economy.  Therefore, the ALJ found that Plaintiff was not disabled.

## IV.    Issues Before the Court

Plaintiff makes two, well-crafted and focused arguments in support of her contention that the ALJ's decision lacks substantial support in the record as a whole.  First, Plaintiff argues that the RFC failed to account for Plaintiff's moderate difficulties in the area of concentration, persistence, or pace.  (ECF No. 13 at 9)  Second, Plaintiff argues that the ALJ erred by not

contacting Dr. Desai to decipher his purportedly illegible medical records, and thus failed to provide Dr. Cremerius with all relevant records prior to his testimony. (ECF No. 13 at 13)[9]

## V.    Standard of Review

"To be eligible for [disability] benefits, [Plaintiff] must prove that [she] is disabled …." Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); see also Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). A claimant qualifies as disabled "only if [her] physical or mental impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423 (d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, the ALJ follows a five-step process in determining whether a claimant is disabled. "During the process the ALJ must determine: '1) whether the claimant is currently employed; 2) whether the claimant is severely impaired; 3)

---

[9] Defendant's brief addresses several matters that were not directly raised in Plaintiff's brief, including the ALJ's adverse credibility finding and the determination of Plaintiff's severe and non-severe impairments. In reviewing the broad question of whether substantial evidence in the record as a whole supports the Commissioner's decision, the Court has considered the entirety of the ALJ's decision. The Court finds no error regarding the matters that were not raised in Plaintiff's brief. For example, the undersigned finds that the ALJ gave good reasons for the adverse credibility determination, and that substantial evidence supports the ALJ's conclusions in this regard. See Julin v. Colvin, 826 F.3d 1082, 1086 (8th Cir. 2016) (explaining that "[c]redibility determinations are the province of the ALJ" and the deference owed to such determinations); Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) (holding that "[i]f an ALJ explicitly discredits the [plaintiff's] testimony and gives good reasons for doing so, [the reviewing court] will normally defer to the ALJ's credibility determination").

whether the impairment is, or is comparable to, a listed impairment; 4) whether the claimant can perform past relevant work; and if not 5) whether the claimant can perform any other kind of work.'" Andrews v. Colvin, 791 F.3d 923, 928 (8th Cir. 2015) (quoting Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006)). "If, at any point in the five-step process the claimant fails to meet the criteria, the claimant is determined not to be disabled and the process ends." Id. (citing Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005)); see also Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011).

The Eight Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole. See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id. Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1. The credibility findings made by the ALJ;
2. Plaintiff's vocational factors;
3. The medical evidence from treating and consulting physicians;

4. Plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;
5. Any corroboration by third parties of Plaintiff's impairments;
6. The testimony of vocational experts when required, including any hypothetical questions setting forth Plaintiff's impairments.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outsize that zone simply because this Court might have reached a different conclusion had it been the original finder of fact. See also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome.").

## VI.    Analysis of Issues Raised for Review

### A.    RFC & Concentration, Persistence, or Pace

Plaintiff first argues that limiting Plaintiff to simple, routine work, with only limited interaction with supervisors, co-workers, and the public, does not sufficiently account for her moderate limitations in concentration, persistence, or pace. (ECF No. 13 at 9-13) Plaintiff correctly notes the general principle that an RFC must include and account for all of a claimant's impairments. See Newton v. Chater, 92 F.3d 688, 694-95 (8th Cir. 1996). Plaintiff's specific argument rests largely, although not exclusively, on Seventh Circuit case law holding that an RFC that limits a claimant to "simple, repetitive work does not necessarily address deficiencies of concentration, persistence, and pace." O'Connor-Spinner v. Astrue, 627 F.3d 614, 620 (7th Cir. 2010) (emphasis supplied). Defendant responds that Eighth Circuit case law does not

support Plaintiff's contention.  See Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001); Brachtel v. Apfel, 132 F.3d 417, 421 (8th Cir. 1997).

A claimant's RFC is the most that claimant can do despite her limitations.  See 20 C.F.R. § 404.1545(a)(1); Hensley v. Colvin, 829 F.3d 926, 931 (8th Cir. 2016).  In determining a claimant's RFC, an ALJ should consider "all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations."  Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (internal quotations omitted); see also Hensley, 829 F.3d at 931-32 (citation omitted).  While the RFC determination occurs at step four, where the claimant has the burden of proof, the Eighth Circuit has explained that the ALJ has primary responsibility for determining the RFC.  See Hensley, 829 F.3d at 932; Krogmeier, 294 F.3d at 1024.  "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  Hensley, 829 F.3d at 932.

There is no dispute that Plaintiff has moderate difficulty in the area of concentration, persistence, or pace.  The issue is whether the RFC adequately addresses this difficulty.  The Court concludes that, on this record, the RFC is adequate.  Plaintiff's position, if accepted, would push the standard of review beyond its deferential bounds.  Moreover, as will be explained, Plaintiff's reliance on seemingly favorable case law from another circuit does not sufficiently distinguish this case from binding Eighth Circuit precedent.  Finally, as a factual matter, the primary medical source supporting Plaintiff's moderate limitation in concentration, persistence, or pace is Dr. Cremerius.  (Tr. 23)  After considering the totality of Plaintiff's mental impairments, Dr. Cremerius testified that Plaintiff can and should return to work.

As defined in the Commissioner's regulations –

Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings … strengths and weaknesses in areas of concentration and attention can be discussed in terms of [a plaintiff's] ability to work at a consistent pace for acceptable periods of time and until a tasks is completed, and [a plaintiff's] ability to repeat sequences of action to achieve a goal or an objective.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(C)(3). When rating the degree of limitation in concentration, persistence, or pace, the ALJ uses a five-level scale: none, mild, moderate, marked, and extreme. See 20 C.F.R. § 416.920a(c)(4). In this case, there is no dispute that Plaintiff's degree of limitation is "moderate."[10]

The bedrock of Plaintiff's argument herein is that an RFC limitation to simple and routine work does not account for moderate limitations in concentration, persistence, or pace. In her opening brief, Plaintiff relies almost exclusively the Seventh Circuit's decision in O'Connor-Spinner.[11] The law in this Circuit, however, is not as restrictive as Plaintiff contends the law to be in the Seventh Circuit, and the undersigned is bound by the law of the Eighth Circuit. See

---

[10] The ALJ first considered Plaintiff's difficulty in the area of concentration, persistence, or pace at steps 2 and 3, not step 4. (Tr. 21-22) In fact, the ALJ correctly explained that his analysis in this regard was not intended to reflect an RFC assessment, but was

used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 … requires a more detailed assessment by itemizing various functions …. Therefore, the [RFC] assessment reflects the degree of limitation the [ALJ] has found in the … mental function analysis [of steps 2 and 3].

(Tr. 24)

[11] In her reply brief, Plaintiff cites additional authority, including cases from this District. (ECF No. 17 at 4) See Logan-Wilson v. Colvin, 2014 WL 4681459 (E.D. Mo. Sept. 19, 2014); Cain v. Colvin, 2015 WL 2092411 (E.D. Mo. May 2015). The Court agrees that, while these cases are generally favorable to Plaintiff, they are distinguishable. As explained below, the ALJ formulated the RFC on the basis of the entire record, including the expert testimony and opinions of Drs. Cremerius and Stacy. (Tr. 29)

Hood v. United States, 342 F.3d 861, 864 (8th Cir. 2003) (reversing a district court that "embraced the reasoning of" other circuits, instead of the Eighth Circuit, and holding that a district court "is bound [] to apply the precedent of [the Eighth Circuit]").

In our Circuit, an RFC need not use specific diagnostic or symptomatic terms, especially where other descriptive terms have adequately defined the plaintiff's limitations. See Roe v. Chater, 92 F.3d 672, 676 (8th Cir. 1996). In Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001) (citation omitted), the Eighth Circuit concluded that a hypothetical question which includes the "ability to do only simple routine repetitive work, which does not require close attention to detail" sufficiently describes deficiencies of concentration, persistence, or pace. See also Brachtel v. Apfel, 132 F.3d 417, 421 (8th Cir. 1997) (same).

More recently, in Harvey v. Colvin, 839 F.3d 714 (8th Cir. 2016), a plaintiff applied for disability benefits alleging disability based upon mood disorder, anxiety disorder, and the residual effects of a brain tumor. The claimant in Harvey suffered "moderate brain atrophy," and suffered from a "major difficulty" of "overall slowness and slow processing," Id. The ALJ accounted for these limitations in the RFC by limiting the plaintiff to "only simple, routine, and repetitive work, work that doesn't require any close attention to detail or use of independent judgment on the job." Id. The Harvey court approved this hypothetical question, and cited to Howard and Brachtel, indicating the continued vitality of those cases.[12]

---

[12] Newton v. Chater, 92 F.3d 688 (8th Cir. 1996) does not control this case. In that case, the ALJ found that the plaintiff "often" had deficiencies in concentration, persistence, or pace, but the hypothetical presented to the VE merely limited the claimant to simple jobs, and did not specifically include impairments regarding concentration, persistence, or pace. The Eighth Circuit held that the reference to simple jobs in the hypothetical did not constitute inclusion of such impairments. Newton, 92 F.3d at 695. In Brachtel, however, the Eighth Circuit distinguished Newton because in Brachtel, the ALJ included the additional limitations of that the plaintiff could not engage in work requiring "close attention to detail," or at "more than a regular pace," were sufficient additional limitations to distinguish Newton. Brachtel, 132 F.3d at 421.

Apart from Plaintiff's broad contention that, as a matter of law, the RFC in this case is deficient, as a factual matter the RFC is well-supported. There is no dispute that the hypothetical question posed to the VE corresponds directly with the RFC articulated by the ALJ. (Compare Tr. 24, 81) The representative jobs the VE identified, and upon which the ALJ relied (door assembler, wrapper, and food sorter) all require very little training. Specifically, they require a specific vocational preparation ("SVP") level of two. The SVP level listed for each occupation in the DOT connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. An SVP level of two corresponds to unskilled work, which "'need[s] little or no judgment to do" and includes "simple duties that can be learned on the job in a short period of time.'" Hulsey v. Astrue, 622 F.3d 917, 922-23 (8th Cir. 2010) (quoting 20 C.F.R. § 416.968(a)). The amount of training required to do this type of job is "[a]nything beyond a short demonstration up to and including 1 month." Id.

Moreover, the ALJ formulated the RFC on the basis of the entire record, including the testimony of Dr. Cremerius and expert opinions of Dr. Stacy. Dr. Cremerius testified that, apart from Plaintiff's transportation difficulties, she was organized and able to follow-through, she does reasonably well when she is on her medications, and that working would benefit plaintiff. (Tr. 75-77) More importantly, Dr. Cremerius specifically testified that, based on "the symptoms described across … three treating sources," Plaintiff was capable of more routine tasks in settings that required … occasional contact with coworkers and supervisors." (Tr. 75) Dr. Stacy specifically considered Plaintiff's ability regarding sustained concentration and persistence and noted that "[Plaintiff] can carry out simple work instructions. She can maintain adequate

Similarly, in this case, the RFC included more than just a simple work limitation. Rather, the RFC also limited Plaintiff's need to interact with co-workers, supervisors, the public, and further limited Plaintiff to "routine" work. On the record before the Court in this case, as in Brachtel, these additional limitations are "enough to distinguish this case from Newton." Id.

attendance and sustain an ordinary routine without special supervision." (Tr. 104) Dr. Stacy also reported that Plaintiff retained the ability to understand and remember simple instructions. (Tr. 103)

Therefore, substantial evidence in the record as a whole supports a conclusion that Plaintiff's RFC, as outlined by the ALJ and provided to the VE, addresses plaintiff's deficiencies in concentration, persistence, or pace. On the basis of the factual record before this Court, and in consideration of relevant Eighth Circuit case law, Plaintiff is not entitled to remand on her first argument. See Buckner, 646 F.3d at 556; McNamara, 590 F.3d at 610.

**B.     Failure to Follow Up With Dr. Desai Regarding Illegible Medical Records**

Plaintiff's second argument also addresses an alleged flaw in the ALJ's RFC determination, but from a different angle. Plaintiff contends that the ALJ erred by not contacting Dr. Desai regarding his illegible medical records, and Dr. Cremerius did not have all relevant records prior to his testimony. (ECF No. 13 at 13) According to Plaintiff, because of this error, Dr. Cremerius' testimony was incomplete, the ALJ lacked sufficient information to make an informed decision, and therefore, substantial evidence does not support the ALJ's RFC determination. In substance, Plaintiff argues that the ALJ failed to develop the record.

During the course of Dr. Cremerius' hearing testimony, it became clear that he had not received, or no longer had, some of Dr. Desai's treatment notes. Those notes were included in the administrative record as Exhibit B-7F. (Tr. 475-78)[13] This issue was revealed when the ALJ asked for Dr. Cremerius' help in reading illegible portions of Dr. Desai's handwritten treatment notes and Dr. Cremerius could not find those notes. Dr. Cremerius appeared via the telephone,

---

[13] From the hearing transcript, it is clear that the notes in question comprise four pages (Tr. 68-71), and those four pages include both handwritten and typed notes. (Tr. 475-78)

so the ALJ attempted to fax the notes to Dr. Cremerius during the hearing, but the record indicates that attempt was unsuccessful.  (Tr. 68-70)  Instead, the ALJ read the legible portions of Dr. Desai's treatment notes to Dr. Cremerius over the phone, and determined that faxing the documents to him would be unnecessary since the portions of the record the ALJ did not read over the phone were unreadable.  The ALJ was careful to clarify whether there were any notable differences between Dr. Desai's diagnosis and the other medical records in Plaintiff's file.[14]  (Tr. 71-73)

There is no dispute herein that portions of Dr. Desai's handwritten notes are hard to read or illegible.  This circumstance does not necessitate a finding of error.  Although an ALJ has a "duty to develop the record fully and fairly," even when counsel represents Plaintiff, see Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000), an ALJ's failure "to seek additional clarifying statements from a treatment physician" does not require reversal "unless a crucial issue is undeveloped." Jones v. Astrue, 619 F.3d 963, 969 (8th Cir. 2010) (quoting Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)).

More broadly, perhaps, an ALJ's failure to develop the record requires reversal only when insufficient evidence exists in the record to make a disability determination.  See McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011); see also 20 C.F.R. § 416.919a(b) (noting that insufficient or inconsistent evidence triggers situations that may require consultative examinations).  Furthermore, an ALJ may "issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's

---

[14] As discussed above, Dr. Desai's notes reference schizoaffective disorder.  The ALJ asked Dr. Cremerius to explain whether such a diagnosis was inconsistent with the other evidence.  Dr. Cremerius explained why it was not inconsistent.  (Tr. 73-74)

decision." Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994)).

Here, the ALJ did not err in failing to seek additional clarification of Dr. Desai's treatment. First, Plaintiff has not shown that these limited treatment notes contain sufficiently unique information. To the contrary, Dr. Cremerius testified that the legible portions of the notes contained information consistent with the other evidence that he reviewed and considered. (Tr. 73-74; noting that Plaintiff's schizoaffective diagnosis is not substantially distinctive from other diagnoses in other medical records because "[t]hey're all under [listing]12.04 as a mood disorder"). Plaintiff does not appear to take issue with this conclusion.

Second, after reviewing the entire record in this matter, the Court believes that the ALJ's RFC determination rests on sufficient evidence. The full record in this matter consists of: (1) disability, function, and work reports (Tr. 181-244); (2) over 300 pages of medical and education records (Tr. 259-574); and (3) a detailed hearing transcript at which Plaintiff and her lawyer discussed and described her alleged limitations and medical history in detail. (Tr. 36-86) Once the Court factors in the ALJ's adverse credibility determination, nothing in Plaintiff's testimony is considerably at odds with Dr. Cremerius's testimony. Furthermore, Dr. Desai's records at issue in this matter constitute a small fraction of the overall medical evidence in this case. Medical opinions from Drs. Stacy and Cremerius support the ALJ's determinations at steps two, three, and four. Hence, an ALJ could reasonably conclude that the record was sufficiently developed, especially considering the lack of conflicting medical opinions.

Finally, even though an ALJ has a duty to develop the record, even where counsel represents a plaintiff, see Freeman, 208 F.3d at 692, it is relevant to note that, at the end of the

hearing, Plaintiff's attorney advised the ALJ that there was no reason to leave the record in this matter open. (Tr. 85)

The ALJ developed a substantial record, and analyzed Plaintiff's claims in detail. Substantial evidence supports the ALJ's findings. Plaintiff is not entitled to remand based upon this argument.

**VII.** <u>**Conclusion**</u>

For all of the foregoing reasons, the Court concludes that the ALJ's determination that Plaintiff is not disabled is consistent with the Commissioner's regulations and supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the ALJ in this matter is **AFFIRMED**. A separate judgment will be entered this day.

_____/s/ **_John M. Bodenhausen_**_____
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of February, 2017